1   BERNSTEIN LITOWITZ BERGER
        & GROSSMANN LLP
2   DAVID R. STICKNEY  (Bar No. 188574)
    TIMOTHY A. DeLANGE  (Bar No. 190768)
3   DAVID A. THORPE  (Bar No. 216498)
    12481 High Bluff Drive, Suite 300
4   San Diego, CA 92130
    Tel:    (858) 793-0070
5   Fax:    (858) 793-0323
    davids@blbglaw.com
6   timothyd@blbglaw.com
    davidt@blbglaw.com
7
    *Attorneys for Plaintiff New Orleans Employees*
8   *Retirement System*

9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12  NEW ORLEANS EMPLOYEES'              Civil Action No.
    RETIREMENT SYSTEM, Individually and
13  On Behalf of All Others Similarly Situated,    CV 09         1620
                                        CLASS ACTION COMPLAINT FOR
14                          Plaintiff,  VIOLATION OF §§ 11, 12(a)(2) AND 15 OF
                                        THE SECURITIES ACT OF 1933
15      v.
                                        DEMAND FOR JURY TRIAL
16  WELLS FARGO ASSET SECURITIES
    CORPORATION, WELLS FARGO BANK,
17  N.A., DAVID MOSKOWITZ, FRANKLIN
    CODEL, THOMAS NEARY, DOUGLAS K.
18  JOHNSON, GOLDMAN, SACHS & CO.,
    MORGAN STANLEY & CO., INC.,
19  JPMORGAN CHASE, INC., *as successor-in-*
    *interest to* BEAR, STEARNS & CO., INC.,
20  HSBC SECURITIES (USA), INC., CREDIT
    SUISSE SECURITIES (USA), LLC,
21  DEUTSCHE BANK SECURITIES, INC.,
    UBS SECURITIES, LLC, CITIGROUP
22  GLOBAL MARKETS, INC., GREENWICH
    CAPITAL MARKETS, INC., *doing business*
23  *as* RBS Securities, Inc., BARCLAYS
    CAPITAL, INC., BANC OF AMERICA
24  SECURITIES, LLC, BANK OF AMERICA
    CORPORATION *as successor-in-interest to*
25  MERRILL LYNCH, PIERCE, FENNER &
    SMITH, INC.,
26
27
28  (Caption continued on next page)

CLASS ACTION COMPLAINT

BANK OF AMERICA CORPORATION *as
successor-in-interest to* COUNTRYWIDE
SECURITIES CORPORATION, MOODY'S
INVESTORS SERVICE, INC., THE
MCGRAW-HILL COMPANIES, INC.,
FITCH, INC., WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR1 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-3 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR2 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR3 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-2 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-1 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR4 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR5 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-4 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR6 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR7 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-5 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-6 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR8 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-7 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-8 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR10 TRUST, WELLS FARGO
MORTGAGE BACKED SECURITIES
2006-AR11 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-9 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-10 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-AR12 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-AR13 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-11 TRUST,

(Caption continued on next page)

CLASS ACTION COMPLAINT

WELLS FARGO MORTGAGE BACKED
SECURITIES 2006-AR16 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-14 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-AR17 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-13 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-AR15 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-AR14 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-12 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-AR18 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-17 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-15 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-16 TRUST, AND
WELLS FARGO MORTGAGE BACKED
SECURITIES 2006-AR19 TRUST,
WELLS FARGO MORTGAGE BACKED
SECURITIES 2006-18 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-19 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2006-20 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2007-1 TRUST, WELLS
FARGO ALTERNATIVE LOAN 2007-PA1
TRUST, WELLS FARGO MORTGAGE
BACKED SECURITIES 2007-2 TRUST,
WELLS FARGO MORTGAGE BACKED
SECURITIES 2007-AR3 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2007-3 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2007-4 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2007-5 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2007-6 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2007-7 TRUST,
WELLS FARGO MORTGAGE BACKED
SECURITIES 2007-8 TRUST, WELLS
FARGO MORTGAGE BACKED
SECURITIES 2007-9 TRUST, WELLS
FARGO MORTGAGE BACKED

(Caption continued on next page)

CLASS ACTION COMPLAINT

1   SECURITIES 2007-10 TRUST, WELLS
    FARGO MORTGAGE BACKED
2   SECURITIES 2007-11 TRUST, WELLS
    FARGO MORTGAGE BACKED
3   SECURITIES 2007-12 TRUST, WELLS
    FARGO MORTGAGE BACKED
4   SECURITIES 2007-13 TRUST, and WELLS
    FARGO MORTGAGE BACKED
5   SECURITIES 2007-AR4 TRUST,

6

                        Defendants.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      SUMMARY OF THE ACTION ...................................................................................1

II.     JURISDICTION AND VENUE .................................................................................5

III.    THE PARTIES..........................................................................................................6

        A.      Plaintiff .......................................................................................................6

        B.      Defendants ...................................................................................................6

IV.     FACTUAL BACKGROUND...................................................................................13

        A.      The Development Of The Secondary Mortgage Market
                And Subprime Mortgages ...........................................................................13

        B.      The Mechanics Of Structuring Mortgage Pass-Through
                Certificates .................................................................................................15

        C.      Assessing The Quality Of A Mortgage Pass-Through
                Certificate Investment ...............................................................................17

        D.      The Role Of The Ratings Agencies In Structuring And
                Rating Certificates .....................................................................................18

V.      CERTIFICATES OFFERED BY DEFENDANTS ..................................................19

VI.     DEFENDANTS MISREPRESENTED THE NATURE OF THE
        LOANS UNDERLYING THE CERTIFICATES ....................................................21

        A.      Representations Regarding Loan Origination Underwriting .........................22

        B.      Representations Regarding Appraisals .........................................................23

        C.      Representations Regarding Credit Enhancement...........................................24

        D.      Defendants' Representations Failed To Disclose The True
                Risk Of Investing In The Certificates ..........................................................25

                1.      The Deterioration Of Underwriting Standards ..................................25

                2.      The Investment-Grade Ratings Misrepresented The
                        True Risk Of The Certificates...........................................................26

VII.    MATERIAL MISSTATEMENTS AND OMISSIONS IN THE
        OFFERING DOCUMENTS ....................................................................................26

VIII.   CLASS ACTION ALLEGATIONS .........................................................................30

FIRST CAUSE OF ACTION  For Violation of Section 11 of the
    Securities Act (Against The Individual Defendants, Issuing
    Defendants and Underwriter Defendants) ....................................................................... 32

SECOND CAUSE OF ACTION  For Violation of Section 12(a)(2) of the
    Securities Act (Against the Issuing Defendants and Underwriter
    Defendants)........................................................................................................................34

THIRD CAUSE OF ACTION  For Violation of Section 15 of the
    Securities Act (Against the Depositor and Wells Fargo Bank) ..................................................35

RELIEF REQUESTED...........................................................................................................................36

Plaintiff New Orleans Employees' Retirement System brings this securities class action on behalf of itself and all persons or entities (the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Wells Fargo Issuing Trusts (defined, *infra*) pursuant to or traceable to Wells Fargo Asset Securities Corporation's (the "Depositor") July 29, 2005 Registration Statement, as amended on August 31, 2005 (the "July 2005 Registration Statement"), the Depositor's October 20, 2005 Registration Statement, as amended on December 21, 2005, January 24, 2006, January 31, 2006, and March 17, 2006 (the "October 2005 Registration Statement"), and the Depositor's September 27, 2006 Registration Statement, as amended on October 11, 2006 and August 15, 2007 (the "September 2006 Registration Statement"), along with their accompanying prospectuses and prospectus supplements.[1]    By this action, Plaintiff seek redress pursuant to the Securities Act of 1933 (the "Securities Act") against defendants the Depositor, Wells Fargo Bank, N.A. ("Wells Fargo Bank"), David Moskowitz, Franklin Codel, Thomas Neary, Douglas K. Johnson, Goldman, Sachs & Co., Morgan Stanley & Co., Inc., JPMorgan Chase, Inc., *as successor-in-interest to* Bear, Stearns & Co., Inc., HSBC Securities (USA), Inc., Credit Suisse Securities (USA), LLC, Deutsche Bank Securities, Inc., UBS Securities, LLC, Citigroup Global Markets, Inc., Greenwich Capital Markets, Inc., Barclays Capital, Inc., Banc of America Securities, LLC, Bank of America Corporation *as successor-in-interest to* Merrill Lynch, Pierce, Fenner & Smith, Inc., Bank of America Corporation *as successor-in-interest to* Countrywide Securities Corporation, Moody's Investors Service, Inc., The McGraw-Hill Companies, Inc., Fitch, Inc., and the Issuing Trusts.[2]    Plaintiff specifically disclaims any allegations of fraud in connection with the Securities Act claims, which are not based on any allegations of knowing or reckless misconduct on the part of any defendant.

I.    SUMMARY OF THE ACTION

1.    This action arises from defendants' sale of mortgage pass-through certificates using false and misleading offering documents.    Mortgage pass-through certificates are securities entitling the holder to income payments from pools of mortgage loans and/or mortgage-backed securities ("MBS").

---

[1]  The July 2005 Registration Statement, October 2005 Registration Statement and September 2006 Registration Statements are collectively referred to as the "Registration Statements."

[2]  The Issuing Trusts Defendants are set forth in ¶35, *infra*.

Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default. In this regard, rating agencies played an important role in the sale of such securities to investors. Credit rating agencies were supposed to evaluate and report on the risk associated with investment alternatives. Based on the rating agencies' purported analysis of the loan pools, the certificates received high ratings, including "triple-A," categorizing them as investment-grade securities. As alleged below, however, defendants misrepresented the quality of the loans in the loan pools and gave unjustifiably high ratings to the certificates.

2.      On July 29, 2005, the Depositor filed with the Securities and Exchange Commission ("SEC") the Form S-3 July 2005 Registration Statement under the Securities Act, whereby it indicated its intention to sell mortgage pass-through certificates ("Certificates") through a yet-to-be-determined number of individual entities created solely to issue the Certificates (the "Issuing Trusts"). The Certificates were to be issued pursuant to the Registration Statement and an accompanying prospectus, filed with the SEC on February 21, 2006 (the "February 2006 Prospectus"), generally explaining the structure of the Issuing Trusts and an overview of the Certificates.

3.      On October 20, 2005, the Depositor filed with the SEC the Form S-3 October 2005 Registration Statement under the Securities Act, whereby it indicated its intention to sell additional Certificates through a yet-to-be-determined number of Issuing Trusts. The Certificates were to be issued pursuant to the Registration Statement and an accompanying prospectus, filed with the SEC on March 20, 2006 (the "March 2006 Prospectus"), generally explaining the structure of the Issuing Trusts and an overview of the Certificates.

4.      On September 27, 2006, the Depositor filed with the SEC the Form S-3 September 2006 Registration Statement under the Securities Act, whereby it indicated its intention to sell additional Certificates through a yet-to-be-determined number of Issuing Trusts. The Certificates were to be issued pursuant to the Registration Statement and an accompanying prospectus, filed with the SEC on

August 27, 2007 (the "August 2007 Prospectus"), generally explaining the structure of the Issuing Trusts and an overview of the Certificates.[3]

5.      The Certificates were then sold to investors by the Underwriter Defendants, as defined herein, pursuant to a series of prospectus supplements, which were also filed with the SEC and incorporated by reference into the Registration Statements ("Prospectus Supplements").  Each Prospectus Supplement included a detailed description of that Issuing Trust and its respective Certificates.  The Registration Statements, Prospectuses and each of the respective Prospectus Supplements are collectively referred to herein as the Offering Documents.

6.      As set forth below, the Offering Documents contained materially false and misleading statements and omitted material information in violation of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Defendants are strictly liable for these misstatements under the Securities Act.

7.      Wells Fargo Bank is one of the largest diversified financial services companies in the United States, and the parent company of the Depositor.  Through its various subsidiaries, the Depositor, Wells Fargo Bank originated and/or purchased residential mortgage loans through bulk purchases for securitization or resale.  Many of the mortgage loans originated or purchased by Wells Fargo Bank were pooled together by the Depositor and deposited into qualifying special purpose entities and sold to investors in the form of Certificates.  The Certificates were packaged in "tranches" by different levels of risk and reward.  The Certificates entitle investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the Issuing Trusts.  As the original borrowers on each of the loans paid their mortgages, distributions were made to investors in accordance with the terms of the Certificates.  If borrowers failed to pay back their mortgages, defaulted, or foreclosed, these losses flowed to investors based on the seniority of their Certificates.

8.      Thus, the investment quality of the Certificates was necessarily linked to the quality of the mortgage loan pools held by each Issuing Trust.  The Offering Documents included several representations or omissions regarding: (i) the underwriting standards used by the loan originators;

---

[3] The February 2006 Prospectus, March 2006 Prospectus and August 2007 Prospectus are collectively referred to as the "Prospectuses."

(ii) the standards and guidelines used by the Depositor when evaluating and acquiring the loans; (iii) the appraisal standards used to value the properties collateralizing the loans, and the corresponding loan-to-value ratios of the loans; (iv) the credit enhancement supporting the loan securitization process; and (v) the pre-established ratings assigned to each tranche of Certificates issued pursuant to the Offering Documents.

9.       This action relates to Certificates issued by fifty-four (54) Issuing Trusts (as set forth in ¶35, herein) purchased by Plaintiff and other Class members. While all of the Certificates were offered pursuant to the Registration Statements and Prospectuses, each Issuing Trust issued its own Prospectus Supplement offering Certificates related only to its unique loan pool. Plaintiff purchased Wells Fargo Mortgage Pass-Through Certificates Series 2006-3, 2006-6, 2006-AR2, 2006-AR8, 2006-AR10, 2006-AR11, and 2006-AR17, pursuant to the Prospectus Supplements filed by the respective Issuing Trusts. Each of the Prospectus Supplements is identical, or nearly identical, in substance, with exceptions related to the tabular data regarding the pool of loans underlying each series of Certificates.

10.       The Certificates issued by each Issuing Trust were divided into several classes, or "tranches," which had different priorities of seniority, payment, exposure to risk and default, and interest payments. Moody's Corp., through its division Moody's Investors Service, Inc. ("Moody's"), and The McGraw-Hill Companies, Inc., through its division, Standard & Poor's ("S&P"), and Fitch, Inc. ("Fitch") directly and indirectly participated in and took steps necessary for the distribution of the Certificates. In addition, Moody's, S&P, and Fitch directly participated in the selection of the underlying mortgages to be securitized and issued by each Issuing Trust. Moreover, as a condition to the issuance of the Certificates, Moody's, S&P, and Fitch rated the investment quality of the Certificates with pre-determined ratings. These ratings, which were expressly included in each of the Prospectus Supplements, in part, determined the price at which these Certificates were offered to Plaintiff and the Class. Moody's, S&P, and Fitch assigned investment-grade ratings on all tranches of the offered Certificates.

11.       The highest investment rating used by Moody's is "Aaa." The highest rating used by S&P and Fitch is "AAA." These ratings signify the highest investment-grade, and are considered to be of the "best quality," and carry the smallest degree of investment risk. Ratings of "AA," "A," and

"BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. These ratings are considered "investment-grade ratings." Any instrument rated lower than BBB is considered below investment-grade, or "junk bond."

12.     As alleged more fully below, the Offering Documents misstated and omitted material information regarding the quality of the loans underlying the Certificates and the process by which the Depositor acquired those loans. Specifically, the Offering Documents failed to disclose, *inter alia*, that the loan originators had systematically not followed their stated and pre-established underwriting and appraisal standards and that the Depositor did not follow its purchasing guidelines and overpaid for underlying mortgages without regard to the quality of the loans for the sole purpose of increasing its position in the mortgage lending and securitization industry. Likewise, the underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties.

13.     As a result of the materially false and misleading statements in the Offering Documents, Plaintiff and the Class purchased Certificates that were far riskier than represented and that were not of the "best quality," or even "medium credit quality." Consequently, certain Certificate tranches represented to be investment-grade instruments were later revealed to be below investment-grade instruments, or "junk bonds." The downgrades in the ratings to below investment-grade caused the value of the Certificates to collapse. The Certificates continue to lose value as delinquencies, defaults and foreclosures related to the mortgages underlying the Certificates continue to increase. As a result, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District. Further, defendant Wells Fargo Bank maintains its principal offices at 420 Montgomery Street, San Francisco, California.

16.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

III.     THE PARTIES

A.     Plaintiff

17.     Plaintiff New Orleans Employees' Retirement System ("Plaintiff" or "New Orleans") is a defined benefit pension plan created under the laws of the state of Louisiana, and provides retirement, death, and disability benefits to all officers and employees of the City of New Orleans. New Orleans maintains over $350 million in assets for its beneficiaries. New Orleans purchased several series of Certificates, as reflected on its Certification, attached at Exhibit 1 hereto.

B.     Defendants

18.     Defendant Wells Fargo Asset Securities Corporation (previously defined as the "Depositor") is the depositor for the offerings. The Depositor is a direct and wholly owned subsidiary of Wells Fargo Bank.

19.     Defendant Wells Fargo Bank, N.A. (previously defined as "Wells Fargo Bank") is the parent and at all times the controlling entity of the depositor, Defendant the Depositor. According to its SEC filings, Wells Fargo Bank maintains its principal offices located at 420 Montgomery Street, San Francisco, California 94163.

20.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") is an investment banking firm and was one of the underwriters for certain Certificates. Goldman Sachs helped draft and disseminate the offering documents.

21.     Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") is an investment banking firm and was one of the underwriters for certain Certificates. Morgan Stanley helped draft and disseminate the offering documents.

22.     Defendant JPMorgan Chase, Inc. ("JPMorgan") is the *successor-in-interest* to Bear Stearns & Co. Inc. ("Bear Stearns"). Bear Stearns was one of the underwriters for certain Certificates. Bear Stearns helped draft and disseminate the offering documents.

23.     Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank") is an investment banking firm and was one of the underwriters for certain Certificates.   Deutsche Bank helped draft and disseminate the offering documents.

24.     Defendant UBS Securities, LLC ("UBS") is an investment banking firm and was one of the underwriters for certain Certificates.  UBS helped draft and disseminate the offering documents.

25.     Defendant Credit Suisse Securities (USA), LLC ("Credit Suisse"), formerly Credit Suisse First Boston, LLC, is an investment banking firm and was one of the underwriters for certain Certificates.  Credit Suisse helped draft and disseminate the offering documents.

26.     Defendant Greenwich Capital Markets, Inc. d/b/a RBS Securities Inc. ("RBS") is an investment banking firm and was one of the underwriters for certain Certificates.  RBS helped draft and disseminate the offering documents.

27.     Defendant Barclays Capital, Inc. ("Barclays") is an investment banking firm and was one of the underwriters for certain Certificates.  Barclays helped draft and disseminate the offering documents.

28.     Defendant Banc of America Securities, LLC ("BAS") is an investment banking firm and was one of the underwriters for certain Certificates.  BAS helped draft and disseminate the offering documents.

29.     Bank of America Corporation ("BofA") is the *successor-in-interest* to both Countrywide Securities Corporation ("CSC") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill").  CSC and Merrill were underwriters for certain Certificates.  CSC and Merrill helped draft and disseminate the offering documents.

30.     Defendant The McGraw-Hill Companies, Inc. is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020, and several offices located in California.  Standard & Poor's ("S&P," as defined previously), a division of McGraw-Hill Companies, provides credit ratings, risk evaluation, investment research and data to investors.  S&P acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).   S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.   In

addition, S&P analyzed certain Certificate offerings to address the likelihood of the receipt of all distributions on the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

31.     Defendant Moody's Corp. is a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007, and a regional office in California. Moody's Investors Service, Inc. ("Moody's," as defined previously), a division of Moody's Corp., provides credit ratings, research and risk analysis to investors. Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition, Moody's analyzed certain Certificate offerings to address the likelihood of the receipt of all distributions on the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

32.     Defendant Fitch, Inc. ("Fitch"), doing business in California as Fitch Ratings, is a credit rating agency with its principal offices located at One State Street Plaza, New York, New York 10004. Fitch provides credit ratings, research and risk analysis to investors. Fitch acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). Fitch participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. In addition, Fitch analyzed certain Certificate offerings to address the likelihood of the receipt of all distributions on the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

33.     Defendants The McGraw-Hill Companies, Inc., inclusive of S&P, Moody's Corp., inclusive of Moody's, and Fitch are collectively referred to herein as the "Rating Agency Underwriters."

34.     Goldman Sachs, Morgan Stanley, JPMorgan, Deutsche Bank, UBS, Credit Suisse, RBS, Barclays, BAS, BofA and the Rating Agency Underwriters are collectively referred to herein as the "Underwriter Defendants."

35.     Defendants, the Issuing Trusts, were created and structured by the Depositor to issue billions of dollars worth of Certificates pursuant to the Registration Statements and Prospectuses. For

each offering by the Issuing Trusts, Wells Fargo Asset Securities Corporation served as the "Depositor" and Wells Fargo Bank served as the "Sponsor." The following chart identifies (1) each Issuing Trust; (2) the stated value of the Certificates issued; and (3) the Registration Statement and Prospectus Supplement dates pursuant to which the Certificates were issued and sold.

| Registration Statement | Issuing Trust | Prospectus Supplement Date | Principal Amount |
| --- | --- | --- | --- |
| July 2005 | Wells Fargo Mortgage Backed Securities 2006-AR1 Trust | 2/24/2006 | $850,233,563 |
| July 2005 | Wells Fargo Mortgage Backed Securities 2006-2 Trust | 2/27/2006 | $1,410,383,491 |
| July 2005 | Wells Fargo Mortgage Backed Securities 2006-1 Trust | 2/27/2006 | $450,447,670 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-3 Trust | 2/27/2006 | $945,143,634 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR2 Trust | 2/27/2006 | $4,177,015,534 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR3 Trust | 2/27/2006 | $602,408,867 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR4 Trust | 3/22/2006 | $1,197,886,870 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR5 Trust | 3/23/2006 | $1,190,485,738 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-4 Trust | 3/30/2006 | $953,944,124 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR6 Trust | 3/30/2006 | $1,783,716,655 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR7 Trust | 4/24/2006 | $999,342,580 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-5 Trust | 4/26/2006 | $286,950,878 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-6 Trust | 4/27/2006 | $1,099,170,858 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR8 Trust | 4/27/2006 | $1,487,893,242 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-7 Trust | 5/26/2006 | $423,287,172 |

| Registration Statement | Issuing Trust | Prospectus Supplement Date | Principal Amount |
|---|---|---|---|
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-8 Trust | 6/29/2006 | $1,400,281,556 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR10 Trust | 6/29/2006 | $2,942,525,599 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR11 Trust | 7/27/2006 | $792,251,260 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-9 Trust | 7/28/2006 | $1,293,979,413 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-10 Trust | 7/31/2006 | $825,873,877 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR12 Trust | 8/25/2006 | $1,449,247,012 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR13 Trust | 8/25/2006 | $783,985,371 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-11 Trust | 8/29/2006 | $1,000,133,567 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR16 Trust | 9/21/2006 | $500,564,197 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-14 Trust | 9/22/2006 | $600,308,453 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR17 Trust | 9/26/2006 | $696,102,523 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-13 Trust | 9/27/2006 | $900,505,500 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR15 Trust | 9/27/2006 | $400,300,197 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR14 Trust | 9/28/2006 | $2,000,504,205 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-12 Trust | 9/29/2006 | $900,370,208 |
| October 2005/ September 2006 | Wells Fargo Mortgage Backed Securities 2006-AR18 Trust | 10/24/2006 | $1,201,560,680 |
| October 2005/ September 2006 | Wells Fargo Mortgage Backed Securities 2006-17 Trust | 10/25/2006 | $325,987,479 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-15 Trust | 10/26/2006 | $3,250,192,093 |

CLASS ACTION COMPLAINT

| Registration Statement | Issuing Trust | Prospectus Supplement Date | Principal Amount |
|---|---|---|---|
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-16 Trust | 10/27/2006 | $1,504,850,538 |
| October 2005 | Wells Fargo Mortgage Backed Securities 2006-AR19 Trust | 11/21/2006 | $800,545,723 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2006-18 Trust | 11/27/2006 | $2,500,285,314 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2006-20 Trust | 11/28/2006 | $200,260,196 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2006-19 Trust | 11/28/2006 | $275,168,798 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-1 Trust | 1/29/2007 | $600,991,640 |
| September 2006 | Wells Fargo Alternative Loan 2007-PA1 Trust | 2/26/2007 | $723,520,492 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-2 Trust | 2/28/2007 | $1,505,652,587 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-AR3 Trust | 3/20/2007 | $488,796,716 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-4 Trust | 3/27/2007 | $1,800,061,020 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-3 Trust | 3/28/2007 | $1,354,453,990 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-6 Trust | 4/27/2007 | $700,312,919 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-5 Trust | 4/27/2007 | $461,281,364 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-7 Trust | 5/29/2007 | $5,100,122,414 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-9 Trust | 6/28/2007 | $751,843,367 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-8 Trust | 6/29/2007 | $2,750,025,945 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-10 Trust | 6/29/2007 | $1,700,746,270 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-11 Trust | 7/31/2007 | $3,954,809,375 |

| Registration Statement | Issuing Trust | Prospectus Supplement Date | Principal Amount |
|---|---|---|---|
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-13 Trust | 8/27/2007 | $500,014,779 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-12 Trust | 8/27/2007 | $375,715,933 |
| September 2006 | Wells Fargo Mortgage Backed Securities 2007-AR4 Trust | 8/28/2007 | $421,914,996 |

36.     Defendants the Depositor, Wells Fargo Bank and the Issuing Trusts are collectively referred to herein as the "Issuing Defendants."

37.     Defendant David Moskowitz ("Moskowitz") was, during the relevant period, a Director, the President, Chief Executive Officer (Principal Executive Officer), and Secretary of the Depositor. Moskowitz signed the Registration Statements pursuant to which the various Certificates were offered either on behalf of himself or by the authorized Attorney-in-Fact.

38.     Defendant Franklin Codel ("Codel") was, during the relevant period, the Executive Vice President, Chief Financial Officer (Principal Financial Officer) and Chief Accounting Officer of the Depositor.  Codel signed the Registration Statements pursuant to which the various Certificates were offered either on behalf of himself or by the authorized Attorney-in-Fact.

39.     Defendant Douglas K. Johnson ("Johnson") was, during the relevant period, a Director of the Depositor. Johnson signed the Registration Statements pursuant to which the various Certificates were offered either on behalf of himself or by the authorized Attorney-in-Fact.

40.     Defendant Thomas Neary ("Neary") was, at all times during the relevant period, a Director and an Executive Vice President of the Depositor.  Neary signed the Registration Statements pursuant to which the various Certificates were offered on behalf of himself and as the authorized Attorney-in-Fact.

41.     Defendant2 Moskowitz, Codel, Johnson and Neary are collectively referred to herein as the "Individual Defendants."

IV.    FACTUAL BACKGROUND

        A.    The Development Of The Secondary Mortgage Market And Subprime Mortgages

        42.    Traditionally, consumers wishing to finance the purchase of a house (or other property) were able to obtain a 30-year or 15-year fixed rate mortgage or a conventional adjustable rate mortgage ("ARM") through a mortgage lender that would profit by servicing the loans and collecting interest payments over the life of the mortgages.  As such, the lender (or loan originator) had an interest in making sure that borrowers were able to repay their loans; or that loans were at least adequately collateralized in the case of default.

        43.    To increase available funds for borrowers, the U.S. government chartered Government Sponsored Enterprises, such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Fannie Mae and Freddie Mac were empowered to buy mortgages (*i.e.*, the rights to repayment of the loans) from loan originators, thus developing a secondary market for mortgages.  Once bought, the loans were pooled together, securitized and sold to investors as "mortgage backed securities," or "MBS."  The money that a loan originator earned from the loan sales was then used to finance new mortgages, thereby increasing the lender's revenues.

        44.    Investors who purchased MBS would (typically) receive monthly payments over the lifetime of the underlying loans, in accordance with the borrowers' payments of principal and interest. To protect MBS investors, Fannie Mae and Freddie Mac only purchased loans that met approved underwriting standards.  In addition, the prices of the MBS were discounted to account for an assumed rate of default or non-payment of a certain percentage of loans.

        45.    From 1995 to 2005, the housing market experienced a dramatic rise in home ownership. According to the Research Department of the Federal Reserve Bank of San Francisco ("FRBSF"), after decades of relative stability, the rate of U.S. homeownership began to surge as 12 million more Americans became homeowners between 1994 and 2004.  The increased demand also resulted in a growth in new home construction.  In 2005, according to the U.S. Census Bureau, 1,283,000 newly-constructed single-family houses sold, compared with an average of 609,000 per year from 1990 to 1995.

46.    Wells Fargo Bank and other entities became active in and profited from the lucrative secondary market for mortgage loans. Unlike Fannie Mae and Freddie Mac, banks were not constrained by the same strict conditions and restrictions when purchasing loans from loan originators. As the secondary market for loans originated with less stringent underwriting standards expanded, loan originators were increasingly able to lend to borrowers with higher credit-risk profiles without absorbing all of the increased risk. In exchange for the increased risk of default and/or delinquencies, the loan originators provided the loans at higher interest rates – *i.e.*, subprime loans – with higher potential rates of return, due to the higher interest percentage charged to the borrowers and thus the higher rate of return to investors in the secondary market.

47.    In recent years, several factors led to greater demand for subprime and alternative loan mortgages in the secondary market. Perhaps the most significant factor was the introduction of new pricing models, the Gaussian copula models developed by David X. Li, which allowed for rapid pricing of exotic finance structures that relied upon pooled mortgages and MBS. The increased demand in the secondary market, along with persistent low interest rates and low inflation (perhaps caused by the increased demand in the secondary market), facilitated consumer borrowing.

48.    Concurrently, as loan originators increased the amount of loans sold rather than held and serviced, they became less vigilant in guarding against the risk of defaults and delinquencies because they were able to quickly transfer the risk to purchasers in the secondary market. Loan fees and sales revenue became the lender's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan. To facilitate more loans, lenders began to offer more aggressive loan products such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans, with little or no documentation. In addition, it is now known that loan originators did not follow their stated underwriting and appraisal standards, and other methods of risk assessment, in order to increase loan origination quantities.

49.    According to Harvard University's Joint Center for Housing Studies, between 2001 and 2005, the subprime market grew from just $210 billion (in real terms) to $625 billion, amounting to approximately 20% of the total residential loans originated in 2005. The FRBSF observed that "it seems probable that the growth in the subprime market [gave] many households access to credit that

would previously have been denied." This time period also saw a dramatic growth in Alt-A loans, a characteristic of which was reduced or eliminated documentation required to secure a mortgage (commonly referred to as a "liar loan"). According to a report by rating agency S&P, Alt-A originations increased from less than $20 billion in 2000 to more than $300 billion in 2005.

50.    The end result was a mortgage paradigm shift where loan originators allowed consumers to borrow more money than they could afford to repay. As consumers were able to borrow more, they were able to spend more. Accordingly, housing prices kept rising. In that environment, consumers who were unable to repay their loans could simply borrow more money (against increased equity) or sell their house at a perpetually increasing price to other consumers – who likely borrowed more than they could afford to repay, as well. Thus, in the sky-rocketing housing market, the effects of the loan originators' over-aggressive lending practices were not immediately realized.

51.    Eventually, however, the aggressive lending practices overburdened the housing market. Housing prices peaked, loan volume leveled-off and loan defaults and delinquencies started to rise. Without underlying repayment revenues and adequate collateral value to support MBS, the credit market began deteriorating and investors in mortgage-backed instruments, directly or through derivative instruments such as mortgage pass-through certificates, experienced tremendous losses.

B.    The Mechanics Of Structuring Mortgage Pass-Through Certificates

52.    Mortgage pass-through certificates are securities in which the holder's interest represents an equity interest in the "issuing trust." The pass-through certificates entitle the holder to income payments from pools of mortgage loans and/or MBS. Although the structure and underlying collateral of the mortgages and MBS vary, the basic principle is the same.

53.    First, a "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens, or a combination of first and junior liens, with various lifetimes to maturity. The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

54.    The issuing trust then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Although technically different instruments, tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward. Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority. As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA." Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.

55.    By working with the underwriters, the depositor, and the rating agencies, the issuing trust is able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-determined rating by pre-determined rating agencies at the time of offering.

56.    Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriters. The underwriter offers the various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriter.



57.    Each purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans. Those payments are collected by the loan servicer and distributed, through the issuing trust, to investors at regular distribution intervals throughout the life of the loans.

58.    Mortgage pass-through certificates must be offered to the public pursuant to a registration statement and prospectus in accordance with the provisions of the Securities Act.

C.     Assessing The Quality Of A Mortgage Pass-Through Certificate Investment

59.     The fundamental basis upon which certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral. Thus, proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans. If the loans pooled in the MBS were to suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, as set forth in the offering prospectus, certificate owners would suffer more than expected losses as income necessary to service the certificates would necessarily diminish.

60.     Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property. In the event of a foreclosure, an accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and thus the amount of money that issuing trust would receive and be able to pass through to certificate holders.

61.     An accurate appraisal is also critical to calculating loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates. The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%. If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000).

62.     From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan. First, borrowers with a small equity position in the underlying property have "less to lose" in the event of a default. Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

63.     Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates. Indeed, prospectuses typically

provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the offered certificates.

64. The underwriting standards and appraisals of the pooled loans are critically important considerations when setting assumptions and parameters for each certificate tranche. The assumed amount of expected payments of principal and interest will necessarily affect the total available funds and potential yield to investors. In addition, the assumed amount of expected payments will affect the offered credit enhancement, such as overcollateralization, excess interest, shifting of interests, and subordination.

65. Overcollateralization is the amount by which the aggregate stated principal balance of the mortgage loans exceeds the aggregate class principal balance for the certificate tranches. In other words, overcollateralization serves as a cushion. so that in the case of default on certain loans, the remaining payments would be adequate to cover the yield on all certificates without any tranche taking a loss.

66. A similar cushion is provided by the interest generated by the loans in excess of what is needed to pay the interest on the certificates and related expenses of the trust. Often, the tranches are structured so that the weighted average interest rate of the mortgage loans is higher than the aggregate of the weighted average pass-through rate on the certificates, plus servicing fee rates on the mortgage loans.

67. If the assumed underwriting standards and appraisals are inaccurate. or the loan purchasing guidelines used to acquire those loans are disregarded, the stated credit enhancement parameters will be inaccurate, and investors will not receive the level of protection as set forth in the respective registration statement and prospectus(es).

D. The Role Of The Ratings Agencies In Structuring And Rating Certificates

68. Traditionally, rating agencies published ratings to reflect an unbiased assessment of risk associated with a particular investment instrument. Historically, an overwhelming majority of the rating agencies' revenues were generated by fees from subscribers who received their research and ratings. In the structured finance arena (*i.e.*, mortgage pass-through certificates and other MBS),

however, rating agencies often played an active role in structuring the very instruments that they rated – and they received lucrative fees for their services.

69.     The rating of any particular MBS was critical to its issuance because of regulations requiring many institutional investors, such as banks, mutual funds and public pension funds, to hold only "investment-grade" bonds and securitized interests.  Indeed, many MBS – including mortgage pass-through certificates – were geared towards, and promoted to, institutional investors.  Here, in fact, each of the Prospectus Supplements stated, "Certificates May Not Be Appropriate for Individual Investors."

70.     As reported in the *International Herald Tribune*, the rating agencies did "much more than evaluate [MBS instruments] and give them letter grades," they played an "integral role" in structuring the transactions and instructing the assemblers "how to squeeze the most profit out" of the MBS by maximizing the tranches with the highest ratings.  Now, it is evident that these credit rating agencies indirectly and directly participated in and took steps necessary to the distribution of mortgage pass-through certificates and other MBS.

## V.     CERTIFICATES OFFERED BY DEFENDANTS

71.     In theory, the loan securitization process entails a series of "arm's-length" transactions where the certificates are valued, appropriately priced and sold to investors.  The depositor pays a fair price to the sponsor/seller based on the represented quality of the pool of loans.  The depositor then verifies the quality of the loans and transfers them to the issuing trust.  The depositor then works with the underwriters to assess the likely cash-flows from the loan repayments and, based on those calculations, sets the parameters and expected yield of each certificate tranche that the underwriter will offer to investors.

72.     In this case, however, the transactions were not arm's-length transactions.  To the contrary, Wells Fargo Bank controlled all of the entities involved at all stages of the process.

73.     Wells Fargo Bank established the Depositor for the sole purpose of issuing the Certificates.  The Depositor filed with the SEC the Registration Statements and Prospectuses, identifying itself as the "Depositor" of a to-be-determined series of Certificate offerings, pursuant to forthcoming Prospectus Supplements.

74.     The Prospectuses and Prospectus Supplements provided information to investors about the Certificates in more detail in progression.  First, the Prospectuses provided general information regarding the Certificate offerings.  Then, the respective Prospectus Supplements provided the specific terms of the particular Certificate series offering.  To the extent that the Prospectuses presented multiple options, investors were told to rely on the information in the respective Prospectus Supplement as to the applicable option.

75.     The Prospectuses, filed on February 21, 2006, March 20, 2006, and August 27, 2007, provided that the Issuing Trusts would offer a series of Certificates representing beneficial ownership interests in the related Issuing Trusts and that the assets of each trust would consist of (i) conventional, fixed or adjustable interest rate mortgage loans secured by first liens or junior liens, or first and junior liens on one- to four-family residential properties, including mortgage participations; (ii) mortgage pass-through certificates and mortgage-backed securities; (iii) direct obligations of the United States or other governmental agencies; or (iv) any combination of the preceding.

76.     Subsequent to filing the Prospectuses, the Depositor caused to be filed Prospectus Supplements for each of the Issuing Trusts.  For example, on February 24, 2006, the Depositor filed with the SEC a Prospectus Supplement offering Mortgage Pass-Through Certificates, Series 2006-AR1, on behalf of the Wells Fargo Mortgage Backed Securities 2006-AR1 Trust.

77.     In the Prospectuses and each of the respective Prospectus Supplements, the Depositor was identified as the Depositor for the Issuing Trusts' Certificate offerings.  While the Depositor served as the Depositor for each of the Issuing Trusts, it was directed and controlled by its parent Wells Fargo Bank.

78.     The Registration Statements, and each of the respective Prospectus Supplements, identified Wells Fargo Bank as the "Sponsor" and "Master Servicer" of the loans acquired by the Depositor.

79.     According to the Registration Statements, Prospectuses and Prospectus Supplements, Wells Fargo Bank originated the loans or otherwise acquired them through bulk or single purchases pursuant to its conduit loan purchase program.  A pool of loans was then sold to the Depositor and passed-through to the Issuing Trusts.

80.     The Depositor then worked with the Underwriter Defendants and Wells Fargo to structure the securitization transactions and price the Certificates. Per the Registration Statements, Prospectuses and Prospectus Supplements, underwriters were designated for the various offerings. In addition, by way of their actual participation and conduct in structuring the transactions, the Rating Agency Underwriters directly and indirectly participated in the distribution process. Specifically, the Rating Agency Underwriters participated in structuring the transactions and, as a condition to the issuance of the Certificates, provided investment-grade ratings as detailed in each of the Prospectus Supplements.

81.     As stated in the Prospectuses and the Supplemental Prospectuses, the Underwriters purchased the Certificates and offered them to investors, including Plaintiff and other Class members. The proceeds from those sales were then transferred to the Depositor, minus applicable underwriting fees.

## VI.     DEFENDANTS MISREPRESENTED THE NATURE OF THE LOANS UNDERLYING THE CERTIFICATES

82.     The Offering Documents contained material statements regarding, *inter alia*, (i) the underwriting process and standards by which the loans held by the respective Issuing Trusts were originated, including the type of loan and documentation level; (ii) the standards and guidelines used by the Depositor when evaluating and acquiring the loans; (iii) a representation of the value of the underlying real estate securing the loans pooled in the respective Issuing Trusts, in terms of LTV averages and the appraisal standards by which such real estate values were measured; and (iv) the level of credit enhancement, such as overcollateralization and excess interest, calculated to afford a certain pre-determined level of protection to investors.

83.     Each Prospectus Supplement included tabular statistics concerning the loans underlying the Certificates, including (but not limited to) the type of loans, the number of loans, the weighted average mortgage rate, the aggregate scheduled principal balance of the loans, the weighted average original combined LTV ratio, and the geographic concentration of the mortgaged properties (in excess of 10% of the aggregate scheduled principal balance).

A.      Representations Regarding Loan Origination Underwriting

84.      Although the percentages vary among the Issuing Trusts, the Prospectus Supplements state that Wells Fargo Bank originated or purchased from various correspondent lenders most of the mortgage loans underlying the Certificates, and that the remaining loans in the pool were originated by one or more originators.  For example, the Wells Fargo Mortgage Backed Securities 2006-AR1 Trust Prospectus Supplement states that no loan originator, other than Wells Fargo Bank, originated or purchased more than 10% of the loans underlying the Series 2006-AR1 Certificates.  Where more than 10% of the loans were originated by any particular loan originator, that originator was identified in the Prospectus Supplement.

85.      The Prospectus Supplements represented that the mortgage loans underlying the Certificates "will have been underwritten either to the Sponsor's standards as set forth herein or, or to such other standards set forth in the applicable prospectus supplement."[4]

86.      In addition, the Prospectus Supplements represented that each of the loan originators, and in certain circumstances the Seller, Wells Fargo Bank, represented and warranted that *each* of the loans originated and/or sold by it was underwritten in accordance with standards consistent with those utilized by mortgage lenders generally during the period of origination.  The Seller, Wells Fargo Bank, represented and warranted that each of the loans sold by it conformed to the requirements of its seller guide.

87.      Furthermore, the Prospectus Supplements represented that each loan mortgagor will have been required to complete an application designed to provide the original lender pertinent credit information concerning the mortgagor and, as part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to his, her, or its assets, liabilities, income (with some noted exceptions), credit history, employment history and personal information.

88.      As noted, the Prospectus Supplements indicated that certain of the loans underlying the Certificates were issued under "no-documentation" programs, which require less documentation or

---

[4] As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

verification than do traditional full documentation programs. A statistical breakdown of the loans categorized by documentation level category is included in the Prospectus Supplement for each Issuing Trust.

89.     Accordingly, pursuant to the Trust Agreement and Mortgage Loan Purchase Agreement (as defined in the Prospectus and/or Prospectus Supplements), the Seller, Wells Fargo Bank, made certain representations, warranties and covenants related to certain Mortgage Loans.

B.     Representations Regarding Appraisals

90.     As stated in the Prospectuses, Wells Fargo Bank's decision to purchase loans in some cases may have been based on the appraisal of the mortgaged property and the LTV ratio at origination. Indeed, the Prospectus Supplements represent an assumption that the related mortgaged properties provide adequate security for the mortgage loans.

91.     The adequacy of the mortgaged property as security for repayment of the loans will have generally been determined by an appraisal in accordance with pre-established guidelines. The Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation, formulates acceptable appraisal standards.

92.     With respect to real estate appraisals, USPAP requires, *inter alia*:

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

In appraisal practice, an appraiser must not perform as an advocate for any party or issue.

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

\*     \*     \*

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.     the reporting of a predetermined result (*e.g.*, opinion of value);

2.     a direction in assignment results that favor the cause of the client;

3.     the amount of a value opinion;

4.     the attainment of a stipulated result; or

5.      the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

93.     The Prospectuses provide information regarding the Combined Loan-to-Value Ratio ("LTV") of the loans underlying the Certificates.  LTV data is provided in the Prospectus Supplements, in association with various loan groupings, including by loan type and documentation level, property type and geographical location.  The Prospectuses state that "Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%."

C.      Representations Regarding Credit Enhancement

94.     Defendants, in structuring the Certificate tranche parameters, provided for certain "Credit Enhancement," as set forth in the Prospectus Supplements.  Credit Enhancement is intended to provide protection to the holders of the Certificates against shortfalls in payments received on the mortgage loans, and helps increase the likelihood of the receipt of all payments under the agreements pursuant to which the Certificates are issued.  The Certificate securitization and offering transactions provide various forms of credit enhancement, including subordination, shifting interests, overcollateralization and excess interest.  Each form of credit enhancement is necessarily dependent on the application and effectiveness of the originator's underwriting standards, as well as an accurate appraisal of the mortgaged real estate and the corresponding LTV ratio.

95.     In addition, the Certificate securitization and offering transactions were structured such that the loans were expected to generate more interest than was needed to pay interest on the Certificates (and related expenses of the Issuing Trust).  Specifically, the weighted average interest rate of the mortgage loan was expected to be higher than the aggregate of the weighted average pass-through rate on the Certificates, plus the servicing fee rate on the mortgage loans.

96.     The credit enhancements represented in the Prospectus Supplements directly impact and correlate with the representations regarding the ratings assigned to each Certificate tranche in a series offering.  As stated in the Prospectus Supplements, the ratings "address the likelihood of the receipt by certificateholders of all distributions of principal and interest to which such certificateholders are entitled . . . .  [R]ating opinions address the structural, legal and issuer aspects associated with the

certificates, including the nature of the underlying mortgage loans and the credit quality of the credit support provider, if any." Wells Fargo Mortgage Backed Securities 2006-AR1 Trust.[5]

97.    Here, the Rating Agency Underwriters worked directly with the Underwriters, the Depositor and Sponsor Wells Fargo Bank to structure the Certificate transactions to achieve certain ratings.  In fact, it was a condition of the issuance of the Certificates that each tranche in the series receive the respective ratings as set forth in the Prospectus Supplements.

D.    Defendants' Representations Failed To Disclose
The True Risk Of Investing In The Certificates

1.    The Deterioration Of Underwriting Standards

98.    From 1995 to 2005, the housing market experienced a dramatic rise in home ownership, as 12 million more Americans became homeowners between 1994 and 2004.  Likewise, in recent years, the subprime market has grown dramatically, enabling more and more borrowers to obtain credit who traditionally would have been unable to access it.  According to Inside Mortgage Finance, from 1994 to 2006, subprime lending increased from an estimated $35 billion, or 4.5 percent of all one-to-four family mortgage originations, to $600 billion, or 20% of originations.

99.    As is now evident, far too much of the lending in recent years was neither responsible nor prudent.  According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 14, 2008 speech at the National Community Reinvestment Coalition Annual Meeting, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis.  A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios."

100.    In its March 2008 Policy Statement on Financial Market Developments, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning*

---

[5]  As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

in late 2004 and extending into early 2007." (Emphasis in original).    As U.S. housing prices subsequently declined, the delinquency rate for such mortgages soared.

2.    The Investment-Grade Ratings
Misrepresented The True Risk Of The Certificates

101.    As detailed above, the Rating Agency Underwriters analyzed the securitization transactions underlying the Certificates and, as a condition to the issuing of the Certificates to the public, provided pre-determined ratings for the Certificates.  These pre-determined credit ratings were, for virtually all tranches of the offered Certificates, investment-grade.

102.    The ratings provided by the Rating Agency Underwriters did not and do not represent the true risk of the Certificates, as they were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default.  The President's Working Group on Financial Markets, Policy Statement Financial Market Developments (March 2008), confirms that there were flaws in credit rating agencies' assessments of subprime MBS and other complex structured financial products, such as mortgage pass-through certificates.

103.    Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*, prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; prohibit credit rating agencies from structuring the same products they rate; and require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

VII.    MATERIAL MISSTATEMENTS AND
OMISSIONS IN THE OFFERING DOCUMENTS

104.    The Registration Statements for the Issuing Trusts contained an illustrative form of a prospectus for use in the offering of the Certificates.  The Registration Statements prepared by the Issuing Defendants and Underwriter Defendants were signed by the Individual Defendants.  Along with the Registration Statements, the Prospectuses filed provided details of the Certificate offerings.  The Prospectuses were prepared by the Issuing Defendants and the Underwriting Defendants.  Subsequently, Prospectus Supplements were filed with the SEC containing a detailed description of the

mortgage pools underlying the Certificates and making certain representations about the loan origination process and the quality of the loans. The Prospectus Supplements were prepared by the Issuer Defendants and the Underwriter Defendants. The Rating Agency Underwriters directly participated in the structuring of the mortgage pools, and as a condition of the issuance of the Certificates, provided the investment-grade ratings predetermined in the Prospectus Supplements. The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements. The Prospectuses were referenced and incorporated into the Registration Statement.

105. The Prospectuses stated the "Mortgage Loan Underwriting" standards concerning the loans underlying each of the Certificates offered pursuant to the Registration Statements. Specifically, with respect to loans the Prospectuses stated:

> Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged properties collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (*i.e.*, the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process. Except as described below, the Mortgage Loans will be underwritten by or on behalf of Wells Fargo Bank generally in accordance with the standards and procedures described herein.

> Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies. These scoring systems assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit and certain loan attributes. Such objective measures are then used to evaluate loan applications and assign each application a "Mortgage Score."

> The portion of the Mortgage Score related to borrower credit history is generally based on computer models developed by a third party. These models evaluate information available from three major credit reporting bureaus regarding historical patterns of consumer credit behavior in relation to default experience for similar types of borrower profiles. A particular borrower's credit patterns are then considered in order to derive a "FICO Score" which indicates a level of default probability over a two-year period.

The Mortgage Score is used to determine the type of underwriting process and which level of underwriter will review the loan file. For transactions which are determined to be low-risk transactions, based upon the Mortgage Score and other parameters (including the mortgage loan production source), the lowest underwriting authority is generally required. For moderate and higher risk transactions, higher level underwriters and a full review of the mortgage file are generally required. Borrowers who have a satisfactory Mortgage Score (based upon the mortgage loan production source) are generally subject to streamlined credit review (which relies on the scoring process for various elements of the underwriting assessments). Such borrowers may also be eligible for a reduced documentation program and are generally permitted a greater latitude in the application of borrower debt-to-income ratios.

106. Each of the Prospectus Supplements identified loan originators that accounted for greater than 10% of the loans in the mortgage pools underlying the Certificates, if applicable. In addition, the Prospectuses provided representations regarding the underwriting standards utilized by correspondent lenders. Specifically, with respect to mortgage loans from correspondent lenders the Prospectuses stated:

In order to qualify for participation in Wells Fargo Bank's mortgage loan purchase programs, lending institutions must (i) meet and maintain certain net worth and other financial standards, (ii) demonstrate experience in originating residential mortgage loans, (iii) meet and maintain certain operational standards, (iv) evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines or the standards of a pool insurer and represent that each loan was underwritten in accordance with Wells Fargo Bank standards or the standards of a pool insurer and (v) utilize the services of qualified appraisers.

The contractual arrangements with Correspondents may involve the commitment by Wells Fargo Bank to accept delivery of a certain dollar amount of mortgage loans over a period of time. This commitment may be satisfied either by delivery of mortgage loans one at a time or in multiples as aggregated by the Correspondent. The contractual arrangements with Correspondents may also involve the delegation of all underwriting functions to such Correspondents ("Delegated Underwriting"), which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondent's representations and, in the case of bulk purchase acquisitions from such Correspondents, Wells Fargo Bank's post-purchase reviews of samplings of mortgage loans acquired from such Correspondents regarding the Correspondent's compliance with Wells Fargo Bank's underwriting standards. In all instances, however, acceptance by Wells Fargo Bank is contingent upon the loans being found to satisfy Wells Fargo Bank's program standards or the standards of a pool insurer. Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's underwriting standards. To the extent that 20% or more of the aggregate principal balance of the Mortgage Loans in a Trust Estate are underwritten by a Correspondent whose underwriting standards vary materially from Wells Fargo Bank's underwriting

standards, the applicable prospectus supplement will describe such underwriting standards for such Mortgage Loans.

107.    The above statements were materially false and misleading when made because they failed to disclose that loan originators: (i) systematically did not follow their stated and traditional underwriting standards and that the underwriting standards actually utilized failed to conform to Wells Fargo Bank's originations standards; and (ii) did not follow their respective corporate policy and procedures relating to origination and quality control practices so that they could increase their loan origination quantity and the resulting fees obtained.

108.    Additionally, the Prospectuses state that "Mortgage Loans will not generally have had at origination a Loan-to-Value Ratio in excess of 95%." This statement was materially false and misleading when made because defendants failed to disclose that the appraisals used to determine the adequacy of the mortgaged property for security for the repayment of the related mortgage loans were not made in accordance with pre-established appraisal procedures and in conformity with USPAP. In addition, the above statement was materially false and misleading when made because the actual LTV ratio for a number of mortgage loans would have exceeded 100% if the underlying properties were appraised according to pre-established appraisal procedures and in accordance with USPAP.

109.    The Prospectuses also represented that the securitization structure of each of the Certificate offerings was structured to include credit enhancement in the form of overcollateralization. These representations were materially false and misleading when made because they failed to disclose that because Wells Fargo Bank obtained mortgages from loan originators that systematically did not follow their underwriting standards and their property appraisal standards, borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value of the loans, and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates. As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

110.    The Prospectus Supplements stated that it was "a condition to the issuance of the Offered Certificates" that they receive respective ratings from the Rating Agency Underwriters, as set forth in the Prospectus Supplements.

111.    Each Prospectus Supplement listed the initial rating of the Certificates being offered by the Issuing Trust. In each, certain Certificates were rated as investment-grade, in accordance with the pre-established rating systems utilized by the Rating Agency Underwriters. For example, the Wells Fargo Mortgage Backed Securities 2006-AR1 Trust Prospectus Supplement included the following chart identifying each Series 2006-AR1 Certificate rating:

**THE SERIES 2006-AR1 CERTIFICATES**

| Class | Initial Principal Balance[1] | Pass-Through Rate | Principal Type[2] | Interest Type[2] | Initial Rating of Offered Certificates[3] S&P | Moody's | Original Form[4] | Minimum Denomination | Incremental Denomination[5] | Final Scheduled Distribution Date[6] |
|---|---|---|---|---|---|---|---|---|---|---|
| Offered Certificates | | | | | | | | | | |
| Class I-A-1 | $137,426,000 | (7) | Senior, Pass-Through | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class I-A-R | $100 | (7) | Senior, Sequential Pay | Variable Rate | AAA | None | D | $100 | N/A | March 25, 2036 |
| Class II-A-1 | $96,469,000 | (8) | Super Senior, Pass-Through | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-2 | $317,343,000 | (8) | Super Senior, Sequential Pay | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-3 | $23,484,000 | (8) | Super Senior, Sequential Pay | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-4 | $72,453,000 | (8) | Super Senior, Sequential Pay | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-5 | $137,426,000 | (8) | Super Senior, Sequential Pay | Variable Rate | AAA | Aaa | BE | $25,000 | $1,000 | March 25, 2036 |
| Class II-A-6 | $31,780,000 | (8) | Super Senior, Support, Pass-Through | Variable Rate | AAA | Aaa | BE | $100,000 | $1,000 | March 25, 2036 |
| Class B-1 | $14,879,000 | (9) | Subordinated | Variable Rate | AA | Aa2 | BE | $100,000 | $1,000 | March 25, 2036 |
| Class B-2 | $7,227,000 | (9) | Subordinated | Variable Rate | A | A2 | BE | $100,000 | $1,000 | March 25, 2036 |
| Class B-3 | $4,250,000 | (9) | Subordinated | Variable Rate | BBB | Baa1 | BE | $100,000 | $1,000 | March 25, 2036 |
| Non-Offered Certificates | | | | | | | | | | |
| Class B-4 | $3,626,000 | (9) | Subordinated | Variable Rate | N/A | N/A | N/A | N/A | N/A | March 25, 2036 |
| Class B-5 | $2,550,000 | (9) | Subordinated | Variable Rate | N/A | N/A | N/A | N/A | N/A | March 25, 2036 |
| Class B-6 | $2,126,463 | (9) | Subordinated | Variable Rate | N/A | N/A | N/A | N/A | N/A | March 25, 2036 |

112.    The above statements, as set forth in ¶¶110-11, were false and misleading when made because they (i) failed to disclose that the ratings assigned to the Certificates did not reflect the true likelihood of the receipt of all payments on the loans; (ii) misrepresented that the ratings considered the actual credit quality of the loans; (iii) misrepresented that the ratings considered the extent to which the payment stream on the loans was adequate to make the payments required by the Certificates; and (iv) misrepresented that certain Certificates were "investment-grade" when they should have been classified as below investment-grade, in accordance with the Rating Agency Underwriters' pre-established rating guidelines.

## VIII.   CLASS ACTION ALLEGATIONS

113.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of itself and all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Issuing Trusts (as set forth in ¶35) pursuant to or traceable to the Depositor's Registration Statements and accompanying Prospectuses and Prospectus Supplements

114. This action is properly maintainable as a class action for the following reasons:

a) The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through discovery, plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b) Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d) A class action is superior to all other methods for a fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action. Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

115. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member. The common questions include, *inter alia*, the following:

a) Whether defendants violated the Securities Act;

b) Whether statements made by defendants to the investing public in the Registration Statements, Prospectuses and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

c) The extent and proper measure of the damages sustained by the members of the Class.

FIRST CAUSE OF ACTION

For Violation of Section 11 of the Securities Act<br>(Against The Individual Defendants, Issuing Defendants and Underwriter Defendants)

116.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

117.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against the Individual Defendants, the Issuing Defendants and the Underwriter Defendants.  This Cause of Action is predicated upon defendants' strict liability for making false and misleading statements in the Offering Documents.

118.    The Registration Statements for the Certificate offerings were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

119.    The Individual Defendants, the Issuing Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

120.    The Individual Defendants each signed the Registration Statements.

121.    The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.  The Underwriter Defendants were underwriters for the respective Issuing Trusts.

122.    The Individual Defendants, Issuing Defendants and Underwriter Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such

statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

123.    The Individual Defendants, Issuing Defendants and Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

124.    Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

125.    The Individual Defendants, Issuing Defendants and Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Prospectuses, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

126.    By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Defendants and Underwriter Defendants violated Section 11 of the Securities Act, and is liable to Plaintiff and the Class.

127.    Plaintiff and other Class members acquired Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

128.    Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, Issuing Defendants and Underwriter Defendants.

129.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Defendants and Underwriter Defendants, as set forth in Section 11 of the Securities Act.

130.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered

to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of Section 12(a)(2) of the Securities Act
(Against the Issuing Defendants and Underwriter Defendants)

131. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

132. This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against the Issuing Defendants and Underwriter Defendants.

133. The Issuing Defendants and Underwriter Defendants promoted and sold Certificates pursuant to the defective Prospectuses for their own financial gain. The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

134. The Issuing Defendants and Underwriter Defendants owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Prospectuses a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading. The Issuing Defendants and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses, as set forth herein.

135. Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Prospectuses. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

136. By reason of the conduct alleged herein, the Issuing Defendants and Underwriter Defendants violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant to and/or traceable to the Prospectuses.

137.     Plaintiff and other Class members were damaged by the Issuing Defendants' and Underwriter Defendants' wrongful conduct. Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act. Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.

138.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectuses and within three years of when the Certificates were sold to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

### THIRD CAUSE OF ACTION

For Violation of Section 15 of the Securities Act
(Against the Depositor and Wells Fargo Bank)

139.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

140.     This Cause of Action is brought against the Depositor and Wells Fargo Bank as controlling persons, pursuant to Section 15 of the Securities Act. Each of the Depositor and Wells Fargo Bank, by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act. Each of the Depositor and Wells Fargo Bank had the power and influence, and exercised that power and influence, to cause the Issuing Defendants to engage in violations of the Securities Act, as described herein.

141.     The Depositor's and Wells Fargo Bank's control, ownership and position made them privy to, and provided them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

142.     By virtue of the wrongful conduct alleged herein, the Depositor and Wells Fargo Bank are liable to Plaintiff and other Class members for their sustained damages.

RELIEF REQUESTED

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)     Declaring this action properly maintainable as a class action and certifying Plaintiff as Class representative;

(b)     Awarding compensatory and/or rescissionary damages in favor of Plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other relief as the Court may deem just and proper.

JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: April 13, 2009

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP

TIMOTHY A. DeLANGE

DAVID R. STICKNEY (Bar No. 188574)
TIMOTHY A. DeLANGE (Bar. No. 190768)
DAVID A. THORPE (Bar. No. 216498)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
davidt@blbglaw.com

*Counsel for Plaintiff New Orleans Employees'
Retirement System*

# EXHIBIT 1

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Jerome Davis, on behalf of New Orleans Employees' Retirement System ("New Orleans"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of New Orleans. I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2. New Orleans did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. New Orleans is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. New Orleans' transactions in the Wells Fargo Mortgage-Backed Securities that are the subject of this action are set forth in the chart attached hereto.

5. New Orleans has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re Celestica, Inc. Securities Litigation*, Case No. 07-cv-312 (S.D.N.Y.)
   *In re NovaGold Resources, Inc. Securities Litigation*, Case No. 08-cv-7041 (S.D.N.Y.)

6. New Orleans has sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *New Orleans Employees' Retirement System v. UBS AG, et al.*, Case No. 09-cv-893 (S.D.N.Y.)

7. New Orleans has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

   *In re Teletech Litigation*, Case No. 08-cv-913 (S.D.N.Y.)

8. New Orleans is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

*Boilermakers National Annuity Trust v. WaMu Mortgage Pass-Through Certificates, Series 2006-AR1, et al.*, Case No. 09-cv-37 (W.D. Wash.)

9. New Orleans will not accept any payment for serving as a representative party on behalf of the Class beyond New Orleans' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of April, 2009.

Jerome Davis
Chairman
*New Orleans Employees' Retirement System*

New Orleans Employees' Retirement System
Transactions in Wells Fargo Mortgage-Backed Securities

| Wells Fargo Mortgage Backed Securities 2006-AR10 Trust | | | |
| --- | --- | --- | --- |
| **Cusip # 94983YAQ2** | | | |
| Transaction | Trade Date | Face Amount | Par Value |
| Purchase | 10/30/2006 | 133,140.71 | 99.8438 |
| | | | |

| Wells Fargo Mortgage Backed Securities 2006-AR2 Trust | | | |
| --- | --- | --- | --- |
| **Cusip # 94983KAG4** | | | |
| Transaction | Trade Date | Face Amount | Par Value |
| Purchase | 2/9/2006 | 325,000.00 | 98.9453 |
| Purchase | 3/27/2006 | 109,119.45 | 98.9180 |
| | | | |

| Wells Fargo Mortgage Backed Securities 2006-AR8 Trust | | | |
| --- | --- | --- | --- |
| **Cusip # 94983VAP0** | | | |
| Transaction | Trade Date | Face Amount | Par Value |
| Purchase | 04/13/2006 | 210,000.00 | 98.1406 |
| | | | |

| Wells Fargo Mortgage Backed Securities 2006-3 Trust | | | |
| --- | --- | --- | --- |
| **Cusip # 94983QAA4** | | | |
| Transaction | Trade Date | Face Amount | Par Value |
| Purchase | 5/24/2006 | 187,924.48 | 98.7969 |
| Sale | 2/25/2009 | (121,972.31) | 78.2500 |
| | | | |

| Wells Fargo Mortgage Backed Securities 2006-6 Trust | | | |
| --- | --- | --- | --- |
| **Cusip # 94984AAC4** | | | |
| Transaction | Trade Date | Face Amount | Par Value |
| Purchase | 6/20/2006 | 149,109.18 | 98.7227 |
| Sale | 4/25/2008 | (121,976.33) | 97.3125 |
| | | | |

| Wells Fargo Mortgage Backed Securities 2006-AR10 Trust | | | |
| --- | --- | --- | --- |
| **Cusip # 94983YAK5** | | | |
| Transaction | Trade Date | Face Amount | Par Value |
| Purchase | 7/28/2006 | 137,859.98 | 99.3555 |
| Sale | 10/30/2006 | (132,104.76) | 100.0352 |
| | | | |

| Wells Fargo Mortgage Backed Securities 2006-AR11 Trust | | | |
| --- | --- | --- | --- |
| **Cusip # 94984CAF3** | | | |
| Transaction | Trade Date | Face Amount | Par Value |
| Purchase | 7/27/2006 | 210,000.00 | 97.7891 |
| | | | |

| Wells Fargo Mortgage Backed Securities 2006-AR17 Trust | | | |
| --- | --- | --- | --- |
| **Cusip # 94984LAA4** | | | |
| Transaction | Trade Date | Face Amount | Par Value |
| Purchase | 9/8/2006 | 435,000.00 | 99.2070 |
| Sale | 5/14/2007 | (233,206.42) | 99.4531 |